**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANGELICA BUENO, YVONNE BRYANT, and CHRISTINE WHITE, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 22-cv-617 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| EXPERIAN INFORMATION SOLUTIONS, INC., | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Angelica Bueno has returned with an amended complaint about a mistake on her credit report. The credit report showed that she had an outstanding debt of $2,810 when, in reality, it was discharged in bankruptcy. The credit report had a mistake. But not all mistakes cause injuries. Some mistakes create windfalls.

The case at hand is case in point. By the look of things, the mistake on Bueno's credit report did not cause her any harm. Quite the opposite. The credit report portrayed the existence of the debt in positive terms, not negative terms.

The credit report listed the debt as part of her "Positive Account Activity." The report celebrated her timely handling of that debt with several pats on the back. The congratulations included an emoji for a "thumbs up," followed by a checkmark and "Great job paying these accounts on time!"

This Court dismissed the original complaint for failure to allege an injury in fact. The complaint did not allege that Bueno suffered a real-world injury from the mistake on her credit report. If anything, the mistake looked helpful, not harmful.

But this Court gave Bueno leave to amend. And this Court gave the parties months to conduct jurisdictional discovery, too. That way, Bueno would have the opportunity to build a record and demonstrate the existence of an injury, if any.

Bueno filed an amended complaint, and two additional plaintiffs emerged on the scene. Discovery came and went. Experian, in turn, filed another round of motions to dismiss.

For the reasons stated below, the motions to dismiss the claims by Plaintiffs Angelica Bueno and Yvonne Bryant are hereby granted. Experian did not move to dismiss the claims by the third plaintiff, Christine White. So her claims remain in the case.

Based on the record, Bueno and Bryant suffered no harm from the mistakes on their credit reports. Plaintiffs are tilting at windfalls.

## Background

### I.    The Original Complaint

This Court already issued an opinion in this case, and the Court assumes that any interested reader knows the background and is up to speed. *See* 3/27/23 Order (Dckt. No. 65).

Suffice it to say that this case is about a mistake on a credit report. Angelica Bueno filed suit against Experian because her credit report showed an "Open" account with a balance of $2,810 owed to Upstart Network. *See* Cplt., at ¶ 62 (Dckt. No. 1). In reality, that debt was discharged in bankruptcy and had a balance of $0. *Id.* at ¶¶ 61–62; *see also* Bueno Bankr. Pet., at 25–29 (Dckt. No. 13-5).

The mistake was short-lived.  Experian prepared her report as of January 21, 2022, roughly four months after the order of discharge.  *See* 1/21/22 Credit Report (Dckt. No. 14-1).  By March 10, 2022, Experian issued an updated credit report showing that Bueno's account with Upstart Network had been discharged in bankruptcy.  *See* 3/10/22 Credit Report, at 4 (Dckt. No. 14-2).  The credit report was inaccurate for less than two months.

The complaint alleged that the credit report had a mistake, but it did not appear to allege that Bueno suffered an injury.  At best, the complaint alleged "[u]pon information and belief" that the inaccuracy negatively affected Bueno's credit score and debt-to-income ratio.  *See* Cplt., at ¶ 81 (Dckt. No. 1).  The complaint also alleged that various companies offered to extend her credit on unfavorable terms, and she suspected that the mistake on her credit report – and not the bankruptcy itself – was to blame.  *See id.* at ¶¶ 82–83.

This Court directed Bueno to file a supplemental statement and address whether she suffered an injury in fact.  *See* 2/4/22 Order (Dckt. No. 4).  Bueno later filed a declaration, but it largely rehashed the complaint's allegations.  *See* Pl. Bueno's Statement Regarding Standing and Damages (Dckt. No. 11).

This Court dismissed the complaint because it failed to allege that Bueno had suffered an injury in fact as required for standing under Article III.  The complaint alleged a mistake, but not an injury.

If anything, the credit report suggested that the mistake helped her, not hurt her.  Experian's credit report categorized information into two buckets:  "Your Potentially Negative Account Activity," and "Your Positive Account Activity."  *See* 1/21/22 Credit Report, at 1, 3 (Dckt. No. 14-1).  It separated the good from the bad.

The section with "Your Potentially Negative Account Activity" summarized the information in the report that cast the debtor in a negative light. "The most common items in this section are late payments, accounts that have been charged off or sent to collection, accounts settled for less than full value, and items that may need closer attention, such as transferred accounts." *Id.* at 1.

On the other end of the spectrum, the section entitled "Your Positive Account Activity" summarized information that cast the debtor in a positive light. "These accounts may stay on your credit report for as long as they are open. Closed or paid-off accounts may continue to appear on your report for up to 10 years. Each of the items in this section has a positive payment history, meaning that no delinquencies or derogatory statuses are reported in the displayable payment history." *Id.* at 3.

That framework set the stage for the debt in question. The $2,810 debt did *not* appear in the section entitled "Your Potentially Negative Account Activity." Instead, it appeared in the section entitled "Your Positive Account Activity." *Id.* at 4. It was a positive, not a negative.

Basically, the report failed to include all of the debts that were discharged in bankruptcy. So, the report understated the amount of money that Bueno failed to repay to her creditors. The report gave the impression that her creditors lost *less* money than they actually lost.

And on the flipside, the report overstated her then-current practices with repaying creditors. The report stated that Bueno was up-to-date in repaying her debt to Upstart Network. In reality, Upstart Network lost all of the $2,810, and wasn't getting repaid at all.

Putting it all together, Experian prepared an inaccurate credit report that mistakenly included a discharged loan. But the inaccurate information painted Bueno in a positive light, not

a negative light. The loan from Upstart Network was listed in the "Positive" section of the report, not the "Negative" section of the report.

As this Court explained, by the look of things, the mistake cut in Bueno's favor. "It is hard to seeing how painting someone in a positive light is an injury. The report didn't paint her in a worse light than she deserved. The report painted her in a better light than she deserved. A windfall isn't an injury." *See* 3/27/23 Order, at 8 (Dckt. No. 65).

After Experian learned about the error, it moved the debt to the section about Bueno's "Potentially Negative Account Activity." *See* 3/10/22 Credit Report, at 3 (Dckt. No. 14-2). The report delivered the bad news: "Discharged through Bankruptcy Chapter 7/Never late." *Id.* Instead of a "thumbs up" and a pat on the back, she received a warning sign. *Id.*

In the end, this Court dismissed the complaint because it appeared that Bueno suffered no injury. "Based on the case at hand, it is hard to see how Bueno suffered a concrete, actual injury. Experian prepared a credit report that failed to show her discharged debt to one creditor. That error made her look better, not worse, than it should have. Instead of a warning sign, she received a 'thumbs up.' And it's hard to see how a 'thumbs up' hurts anybody." *See* 3/27/23 Order, at 9 (Dckt. No. 65).

But this Court recognized that there might be more to the story. So the Court gave Bueno leave to amend. And importantly, the Court gave the parties leave to take jurisdictional discovery. *Id.*

This Court gave Bueno an opportunity to "unearth the facts and build a record," and gave her a "chance to lay a factual foundation to stand on." *Id.* at 11.

## II.    The Amended Complaint

Bueno soon filed an amended complaint, which largely rehashed the allegations of the original complaint.  Instead of adding facts, the amended complaint added people.  The amended complaint included claims by two new plaintiffs, Yvonne Bryant and Christine White.  Their stories are similar, but not quite the same.

After telling the story of each individual plaintiff, the amended complaint makes an overarching observation about how the mistakes depicted their creditworthiness.  The key point is that the mistakes affected their debt-to-income ratios.  The amended complaint alleges, "upon information and belief," that their "credit scores and/or DTI [debt-to-income] ratios would have been better."  *See* Am. Cplt., at ¶ 158 (Dckt. No. 70).

### A.    Bueno

The Court will begin with Angelica Bueno, the original plaintiff.  When it comes to new information, the amended complaint doesn't have much to add.  It's more of the same.

Once again, Bueno alleges that her credit report inaccurately reported that her account with Upstart Network had a balance of $2,810.  *See* Am. Cplt., at ¶ 81 (Dckt. No. 70).  In reality, she owed nothing because of the bankruptcy discharge.  *Id.* at ¶ 80.

And once again, Bueno alleges "[u]pon information and belief" that the inaccurate reporting led to unfavorable credit terms.  *Id.* at ¶¶ 159–61.  The amended complaint gives the same three examples of times when companies offered her loans at high rates.  *Id.*  For example, the down payment for a phone from AT&T was too high.

The amended complaint does not contain any new facts supporting the notion that Bueno suffered an injury in fact from the mistake on her credit report.  It simply repeats the allegations that this Court found lacking last time.

6

### B.     Bryant

The amended complaint tells a similar story for Yvonne Bryant, one of the two new plaintiffs.  Bryant, like Bueno, filed for bankruptcy and received a discharge.  *Id.* at ¶¶ 100–01. Experian later prepared a credit report, and the credit report included information about her bankruptcy.  *Id.* at ¶ 105.

The report listed a number of debts that were, in fact, discharged in bankruptcy.  But the list was underinclusive.  The report inaccurately reported that Bryant continued to owe $2,805 to Regional Finance.  *Id.* at ¶¶ 110–12, 125–26.  In reality, that debt was discharged in bankruptcy, and had a balance of $0.  *Id.*  But for whatever reason, Experian did not include that debt in the list of discharged debts.

The record includes the inaccurate credit report.  Bryant's credit report portrayed the existence of the debt in positive terms.  Bryant's debt to Regional Finance appeared in the section of her report about her "Positive Account Activity."  *See* 4/2023 Bryant Credit Report (Dckt. No. 94-3, at 5 of 11).  The report said that the debt was "Open/Never late."  *Id.* at 7.

Bryant, like Bueno, received a "thumbs up" and thundering applause:  "Great job paying these accounts on time!  Payment history is the biggest factor of your credit score."  *Id.* at 5.

Experian apparently got wind of the mistake, and corrected the credit report one month later.  *See* 5/2023 Bryant Credit Report (Dckt. No. 94-4, at 4 of 11).  Bryant's corrected credit report showed that the debt to Regional Finance was, in fact, discharged in bankruptcy.

The correction moved things in a bad direction.  The credit reported moved Bryant's debt to Regional Finance from the "Positive" section to the "Negative" section of her report.  The debt appeared under the heading "Your Potentially Negative Account Activity."  *See id.* at 5 of 11.  Things went from sunny-side up to sunny-side down.

Bryant's credit score went *down*, not up, after Experian corrected the mistake. Bryant had a credit score of 593 in the inaccurate credit report from April 2023, which shows a debt owed to Regional Finance. *See* 4/2023 Bryant Credit Report (Dckt. No. 94-3, at 3 of 11). But Bryant had a credit score of only 566 in the accurate credit report from May 2023, which included the loan from Regional Finance in the list of discharged debts. *See* 5/2023 Bryant Credit Report (Dckt. No. 94-4, at 4 of 11).

The record sheds light on why her credit score fell by 27 points after Experian corrected the mistake. Bryant's credit report from April 2023 (with the mistake) had six accounts in the "What May Be Helping" side of the ledger, and had four "Late Payments." *See* 4/2023 Bryant Credit Report (Dckt. No. 94-3, at 3–6 of 11). The corrected report showed that the loan from Regional Finance was discharged, so it moved that loan from the good camp to the bad camp.

And then, the tally changed. Bryant's credit report from May 2023 (without the mistake) showed five (not six) accounts in the "What May Be Helping" side of the ledger, and had five "Late Payments." *See* 5/2023 Bryant Credit Report (Dckt. No. 94-4, at 3–6 of 11). Six good and four bad changed to five good and five bad.

Basically, the mistaken credit report showed that Bryant had six good accounts, and four bad accounts. But the corrected report showed that Bryant had five good accounts, and five bad accounts. The numbers moved in the wrong direction, and her credit score fell.

The amended complaint does not say much about any injury suffered by Bryant. The amended complaint alleges that Bryant applied for credit from Discover, Capital One, Credit One, and Kohls. But she was denied credit, "upon information and belief," due to the erroneous inclusion of the $2,805 debt on her credit report. *See* Am. Cplt., at ¶¶ 162–63 (Dckt. No. 70).

### C.     White

Christine White, like Bryant and Bueno, also filed for bankruptcy and received a discharge.  *Id.* at ¶ 129.  But once again, Experian's credit report failed to include all of the discharged debts.  The credit report included a debt owed to Prestige Financial totaling $21,428, even though she owed nothing because of the bankruptcy discharge.  *Id.* at ¶¶ 139–41, 153–55.

White had trouble getting favorable credit, too.  White tried to get auto loans, but she was denied by multiple lenders "due to the inaccurate reporting of the Prestige Account showing she owed more debt than she actually owed."  *Id.* at ¶ 164.

### D.     The Second Round of Motions to Dismiss

Months of jurisdictional discovery followed.  *See* 4/10/23 Order (Dckt. No. 68).  Along the way, this Court gave the parties an extension of time.  *See* 6/20/23 Order (Dckt. No. 78); 7/14/23 Order (Dckt. No. 80).

At the close of discovery, Experian moved to dismiss the claims brought by Bueno and Bryant, but not White.[1]  *See* Mtn. to Dismiss Bueno's Claims (Dckt. No. 85); Mtn. to Dismiss Bryant's Claims (Dckt. No. 87).

Plaintiffs did not seek leave to file a second amended complaint after the close of jurisdictional discovery.  So, the question is whether Plaintiffs Bueno and Bryant suffered an injury in fact sufficient to support standing, viewed in the light of discovery.

### Legal Standard

Article III standing requires an injury in fact.  *See, e.g.*, *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1151 (7th Cir. 2020).  To establish an injury in fact, a plaintiff must show

---

[1]  Experian did not move to dismiss White for lack of standing.  Even so, this Court has an independent obligation to ensure that it has jurisdiction.  This Court will require Experian to file a statement and explain why White suffered an injury, but Bueno and Bryant did not.

that she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). No pain, no gaining access to the federal courthouse.

"Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Id.* at 340. The injury must be "'real,' and not 'abstract.'" *Id.* "Traditional tangible harms, such as physical or monetary harm, easily meet the concreteness requirement." *See Ewing v. MED-1 Solutions, LLC*, 24 F.4th 1146, 1151 (7th Cir. 2022).

The Supreme Court made clear in *Spokeo* that an inaccurate credit report does not automatically lead to an injury in fact that supports standing. *See Spokeo*, 578 U.S. at 342 ("[N]ot all inaccuracies cause harm or present any material risk of harm."). The inaccuracy must have caused harm or created an "imminent and substantial" risk of future harm. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 415 (2021).

A party can bring a facial challenge or a factual challenge to standing. A facial challenge looks to the allegations of the complaint, but a factual challenge looks to the evidence. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). When a party makes a factual challenge, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.*

Pointing to the complaint is not enough when a party makes a factual challenge to standing. A factual challenge is about facts, not allegations. *See Baysal v. Midvale Indem. Co.*, 78 F.4th 976, 978 (7th Cir. 2023) ("[S]tanding must be demonstrated as well as alleged."). The

whole point of a factual challenge is to look behind the curtain of the complaint, and see what's there. *See Lujan*, 504 U.S. at 560–61.

Here, there's no there, there.

### Discussion

Plaintiffs have not fixed the problems that this Court identified in the last go-around. This Court ruled that the original complaint failed to allege that Bueno suffered a real-world harm. The situation now isn't any better.

In fact, it is worse. Last time, this Court relied exclusively on the allegations of the complaint. Since then, the parties had the benefit of jurisdictional discovery. This Court has a record to gaze upon. And after taking a look, the evidentiary cupboard is bare.

The record does not support the notion that Bueno and Bryant suffered a real-world injury from the mistake on their credit reports. Experian dropped the ball, but it did not land on anyone's foot.

### I.      Economic Injury

This Court invited the parties to engage in jurisdictional discovery, and the parties accepted that invitation. The process stretched out for months. Plaintiffs served over a dozen subpoenas. *See* Joint Status Report (Dckt. No. 83). Bueno and Bryant sat for deposition. The goal of the exercise was to give the parties a chance to figure out if they suffered a harm from the mistakes on the credit reports.

Plaintiffs went fishing during discovery, and came up empty. Bueno served subpoenas on AT&T and Clarity/Big Picture Loans, two of the entities that denied her credit. *See* Pl. Bueno's Resp., at 5 (Dckt. No. 102); *see also* Am. Cplt., at ¶¶ 160–61 (Dckt. No. 70). She looked for back-up to support the allegation that they denied her credit "due to the inaccurate

reporting . . . by Defendant showing she owed more debt than she actually owed." *See* Am. Cplt., at ¶ 160; *see also id.* at ¶ 161.

Discovery yielded no documents that supported the existence of an injury. AT&T responded that it had no responsive documents. Big Picture Loans asserted tribal immunity. *See* Pl. Bueno's Resp., at 5 (Dckt. No. 102). In fact, Bueno failed to produce a single document during the entire jurisdictional discovery period. *See* Def.'s Reply, at 1 (Dckt. No. 106).

The record does not include any testimony from the would-be lenders. At one point, Bueno reported that she was working with AT&T to coordinate possible deposition dates. *See* Pl. Bueno's Resp., at 5 (Dckt. No. 102). But since then, this Court has heard nothing. There is no deposition testimony from AT&T in the record. The same goes for Big Picture Loans, too.

Bryant did not gather much of an evidentiary record, either. Bryant served subpoenas on Ally, Kohls, and the other would-be creditors identified in the amended complaint. *See* Pl. Bueno's Resp., at 4–5 (Dckt. No. 98). They produced records showing that they looked at Bryant's credit information. *Id.*

But Ally and Kohls did not produce any records or other evidence about why they gave Bryant unfavorable credit terms, or turned her down altogether. Apparently, those lenders produced only a limited collection of documents. *Id.* ("Ally produced documents showing that Ally obtained Plaintiff's credit information from Experian on multiple occasions. . . . Ally testified that the criteria under which it makes decisions regarding credit offers is proprietary and confidential. Ally would not reveal that criteria."); *see also id.* at 5 ("Kohls provided objections and documents showing Plaintiff's account information, but no information as to Kohls' credit offer criteria or why Kohls only gave Plaintiff a $300 credit limit."). Plaintiffs did not ask this Court to compel them to produce more.

The bottom line is that there is no evidence from any of the would-be lenders that Bueno or Bryant suffered an injury from the mistakes on their credit reports. Bueno and Bryant did not come forward with any documents from the potential creditors. They did not offer any deposition testimony from the would-be creditors, either.

Simply put, there is no evidence in the record that the mistakes in the credit reports played any role in the decisions made by the would-be creditors. The facts do not support the notion that the mistakes in the credit reports led to a denial of credit or unfavorable credit terms.

The same is true about Bueno's credit score. Bueno alleged "upon information and belief" that the inaccuracy negatively affected her credit score. *See* Cplt., at ¶ 81 (Dckt. No. 1). This Court called attention to that allegation in its opinion on the first motion to dismiss. *See* 3/27/23 Order, at 3–4, 10–11 (Dckt. No. 65). But jurisdictional discovery did not reveal any information about Bueno's credit score. There is no evidence that her credit score changed before or after the mistake.[2]

Plaintiffs did not plug the holes with testimony of their own, either. Bueno and Bryant sat for deposition, and the transcripts are in the record. But Plaintiffs do not point to any passages from those depositions to establish that they suffered an economic injury. They barely mentioned the depositions in their response briefs at all.[3]

---

[2] Experian confirmed that Bueno's credit score was unavailable, and explained why. *See* Mem. in Supp. of Mtn. to Dismiss, at 5 (Dckt. No. 86) ("[A credit score] requires at least one undisputed qualifying account in a consumer's credit file to have been updated within the past six months. Bueno's credit file did not meet this criteria, and thus her Experian credit reports could not generate a FICO credit score.").

[3] This Court is not duty bound to read the transcripts for itself, looking for nuggets that might support the existence of standing. *See Lee v. Chicago Youth Centers*, 69 F. Supp. 3d 885, 889 (N.D. Ill. 2014) ("It must be remembered that ours is an adversary system, and it is not the job of judges to do the work of lawyers."); *Kyles v. J.K. Guardian Sec. Servs.*, 236 F.R.D. 400, 402 (N.D. Ill. 2006) ("Judges are not like pigs hunting for truffles, and the Seventh Circuit has stressed time and again that it is not a judge's responsibility to research and construct the parties' arguments.") (citation omitted). Plaintiffs had the opportunity and the obligation to cite any favorable testimony. To the extent that the depositions contained any useful testimony that they did not cite in their response briefs, the argument is waived.

For example, Bueno and Bryant did not testify that the creditors told them that the loans in question made any difference. By all appearances, Plaintiffs did not testify that they received unfavorable credit terms because of the mistakes on their credit reports.

Early in the case, in response to this Court's query about standing, Bueno produced a declaration about her inability to get credit. Bueno did not know why the would-be creditors did what they did. She wondered if they took into account her debt-to-credit ratios. "I don't know for sure yet, but I suspect that the above is what happened with AT&T and T-Mobile." *See* Pl. Bueno's Statement Regarding Standing and Damages, at ¶ 12 (Dckt. No. 11).

Instead of pointing to their own testimony, Plaintiffs offered a declaration from an expert, Thomas Tarter, about Plaintiffs' debt-to-income ratios. That declaration does not get Plaintiffs very far.

The declaration includes almost no information about the Plaintiffs themselves. Worse yet, Tarter expressly assumed that the facts of the complaint were true. That's not particularly helpful when the goal is to figure out *whether* the facts in the complaint are true (when it comes to standing, that is).

Tarter described how the credit industry works, at a high level. Tarter opined about how creditors in the financial sector as a whole make credit decisions when dealing with consumers. He explained that creditors typically place debtors into credit tiers, based on their debt-to-income ratios. *See* Tarter Decl., at ¶ 25(b) (Dckt. No. 98-7).

Then, Tarter opined that the mistakes on the credit reports caused Plaintiffs to have higher debt-to-income ratios than they would have had but-for the mistakes. *Id.* at ¶ 26. That is, the credit reports included more debt than Plaintiffs actually had, because some of it was

discharged. So the ratio of debt to income was higher – all else being equal, more debt equals a higher debt-to-income ratio.

That's a piece of the puzzle, but not the full picture. Tarter did not opine on whether the debt-to-income ratios made any difference when Bueno and Bryant applied for credit. He does not know if any of the would-be creditors calculated their debt-to-income ratios at all, let alone whether the increase made any difference.

Tarter believes that the mistakes on the credit reports would have pushed Bueno and Bryant into lower tiers. *Id.* at ¶¶ 26(b)(i), 26(c)(i). But again, Tarter was simply speculating. There is no evidence that any of the would-be creditors used the tier structure that Tarter envisioned. There is no evidence that the mistakes pushed Bueno and Bryant into lower tiers, either.

It's hard to see how Tarter could know why these lenders did what they did, when there is no evidence in the record about why they did what they did. Experts have no special license to assume facts into existence, and create evidence out of thin air by the pure force of imagination.

In fact, Tarter did not even calculate the debt-to-income ratios for Bueno or Bryant. This Court does not know how much the ratios changed, because Tarter did not calculate them. So, this Court does not know what their debt-to-income ratios should have been, or what their debt-to-income ratios were with the mistakes. This Court does not know whether the change in the ratios pushed Bueno or Tarter into lower credit tiers. And this Court does not know whether the decline mattered to the creditors in question.

At best, Tarter relies on the "general background" of the financial industry, plus some "assumed facts" and his "professional experience." *Id.* at ¶ 26. "For the purpose of rendering observations and opinions in this declaration, I have assumed facts provided to me by the

Plaintiffs and their counsel to be true." *Id.* at ¶ 17. The amended complaint was "accepted as true," which means that the declaration is a long exercise in question-begging. *Id.* at ¶ 22.

The time to "assume[]" facts has long since passed. The question is not how the industry works writ large. The question is whether these two people, Bueno and Bryant, suffered a real-world harm from a mistake on their credit reports. And on that score, Tarter comes up empty.

One can imagine a world in which inflating debts on a credit report could lead to an economic harm. All of us can handle only so much debt, given our incomes. Each of us has a maximum debt capacity. Think of it like space in a coffee cup. The more that's already there, the less room there is for anything else.

If a credit report overstates the amount of credit that is currently on the books, a creditor *might* be less likely to extend more credit. The fuller the cup of debt, the less room there is for more debt. The false credit report *might* suggest that the credit is already near the brim.

Imagine, for example, going to a car dealership and trying to buy a new car. And imagine if your credit report mistakenly said that you had $1 million on your credit cards. Hopefully you have a Plan B for how to get back home.

But here, there is no such evidence in the record. There is no evidence that any of the creditors would have acted differently if they had seen an accurate picture of how much debt Plaintiffs discharged in bankruptcy, and how much debt they continued to carry. It's anyone's guess – and standing cannot rely on guesswork. *See Baysal*, 78 F.4th at 978.

It is too late to put forward a theory about debt-to-income ratios, unadorned by facts. In the last go-around, this Court left open the possibility that including discharged debt on a credit report *might* affect debt-to-income ratios in a way that *might* have caused a harm.

16

In fact, that unanswered question was one of the reasons for engaging in jurisdictional discovery in the first place. *See* 3/27/23 Order (Dckt. No. 65) ("But at this point, that theory is just a theory. The complaint does not allege that Bueno's would-be creditors ever took her debt-to-income ratio into account when they denied her credit (let alone did so with Experian's report). And there are no facts to support that theory, either.").

Judge Tharp's decision in a similar case, *Stagger v. Experian Info. Sols., Inc.*, 2022 WL 632838 (N.D. Ill. 2022), remains on point. In *Stagger*, the plaintiff did "not allege facts, let alone present evidence, that could prove that she was harmed by a higher debt-to-income ratio; she does not even allege that a lender calculated her debt-to-income ratio based on a report from Experian." *Id.* at *3. The same is true here.

Tarter also theorized that potential creditors may not have seen the characterization of the debt as "Positive," because credit reports to consumers "are not representative of the form in which consumer information is relayed to potential creditors." *See* Tarter Decl., at ¶ 25(e)(i) (Dckt. No. 98-7) ("[W]hether a potential creditor ever sees the 'Positive Accounts' moniker is a question unanswerable absent specific inquiry and review into the exact information sent by Experian to a specific potential creditor."). But again, Tarter doesn't really know – he thinks it is "unanswerable." *Id.* And in any event, there is no reason to think that Experian told the consumers that the information was positive, but told creditors that the information was negative.

The bottom line is straightforward. At the end of the day, after months of jurisdictional discovery, the record about any real-world injury is barren. Plaintiffs have not come forward with any evidence that any of the would-be lenders refused to give them credit, or offered them credit on unfavorable terms, because of the mistakes on Experian's credit reports. Without that evidence, there is no evidence of an economic injury.

## II.    Reputational Injury

Pivoting, Plaintiffs argue that they suffered a reputational injury from the inaccurate credit reports.

A reputational injury could give rise to standing.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021).  A reputation is something of value, and a plaintiff could suffer harm if a defendant tarnished that reputation in a real-world way.  *See, e.g.*, *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1154 (7th Cir. 2022) ("The Consumers suffered an intangible, reputational injury that is sufficiently concrete for purposes of Article III standing.  Specifically, they have shown that their injury is related closely to the harm caused by defamation.  Reputational harm of this sort is a real-world injury; being portrayed as a deadbeat who does not pay her debts has real-world consequences."); *see also Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1190–91 (7th Cir. 2021) (concluding that plaintiff had not alleged a concrete injury of reputational harm where he failed to support his allegation that his credit rating was injured).

But the same rules apply to reputational injuries as to other types of injuries.  A reputational injury must be real and concrete, just like any other harm that could give rise to standing.  An injury can be intangible, but an intangible injury must be real, not theoretical.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) ("A 'concrete' injury must be 'de facto'; that is, it must actually exist."); *Nettles v. Midland Funding LLC*, 983 F.3d 896, 899 (7th Cir. 2020) ("A concrete injury is a *real* injury – that is, one that actually exists, though intangible harms as well as tangible harms may qualify.") (emphasis in original); *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 938 (7th Cir. 2022) (opining that a "mere 'risk of real harm'" does not "concretely injure plaintiffs seeking money damages"); *Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 734 (7th Cir. 2023).

18

When it comes to an injury, "concrete reputational harm" counts, but a theoretical harm doesn't. *See TransUnion*, 594 U.S. at 417. An abstract, hypothetical, maybe-it-happened, maybe-it-didn't injury to reputation doesn't open the door to the federal courthouse. *See, e.g.*, *Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 669 (7th Cir. 2015) (concluding that the possibility of reputational harm was "much too 'conjectural or hypothetical' to constitute the type of concrete injury that is required to establish Article III standing"); *Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1066 (7th Cir. 2020) (holding that the suit should have been dismissed for lack of standing because plaintiffs' allegations were "too abstract and conjectural to constitute an injury in fact"); *Baysal v. Midvale Indem. Co.*, 78 F.4th 976, 978 (7th Cir. 2023) ("[A] possible route for a loss does not suffice for standing; the complaint must allege that what is possible actually happened or was 'certainly impending'.").

That's where Plaintiffs' theory about a reputational injury falls apart. Plaintiffs allege that they suffered a reputational injury because of the mistakes on their credit reports. But Plaintiffs do not come forward with any evidence that their reputations took a real-world hit. There is no evidence in the record that any potential lender thought less of them because of the mistakes on their credit reports.[4]

And again, it is not entirely surprising that no such evidence exists. Remember, the credit reports showed that Bueno and Bryant were paying their debts. Bueno's credit report showed

---

[4] Taking a step back, a theory of a reputational injury in the context of credit reports has an artificial feel, to put it mildly. Bueno and Bryant likely had no reputation with the would-be creditors, one way or the other. In the real world, few consumers have reputations with companies (in the traditional sense, anyway). Standing based on a reputational injury can make sense in some settings (*e.g.*, defamation), but those cases tend to involve individual people thinking less of other individual people. The theory is a stretch and an odd fit when the situation involves a consumer and a company. Think about it this way. As a consumer, what's your favorite company? Do you have a reputation there? Unless you're Norm from Cheers, the answer is probably "no."

that she was up-to-date on her payments on the debt to Upstart Network. And Bryant's credit reported showed that she was up-to-date on her payments to Regional Finance.

From a reputational standpoint, paying debts is usually a good thing, not a bad thing. Paying debts is not the sort of thing that hurts someone's reputation. But filing for bankruptcy is.

Taking a step back, at a more basic level, the theory of reputational injury is not intuitive in a case about a favorable mistake on a credit report. To the extent that consumers have a reputation in this context at all, the reputation that matters is the reputation for paying back loans. A reputation for paying back debts is good, and a reputation for not paying back debts is bad.

Creditors may not view a bankruptcy discharge as a good thing, because it means that the consumer failed to repay other creditors. A bankruptcy discharge may help the debtor turn over a new leaf – but the creditors are on the other end of the stick, and they end up holding the bag. A bankruptcy discharge is a loss to other creditors.

Causing losses usually leads to a bad reputation, not a good reputation. And causing a bigger loss is usually worse than causing a smaller loss.

A reputation for stiffing other people isn't likely to instill a lot of confidence in future lenders. After all, creditors do not like to lose money. The fact that a debtor failed to repay other people isn't likely to help that debtor's reputation when applying for future loans.

Under Plaintiffs' theory, would-be creditors would have thought *better* of Bueno and Bryant if they had known the truth. That is, Bueno and Bryant would have had a *better* reputation with future creditors if the creditors had known the full extent of the losses that Bueno and Bryant caused when they filed for bankruptcy. In Plaintiffs' view, the bigger the loss to past creditors, the better the reputation with future creditors.

Plaintiffs' theory seems upside down. As they see it, if future creditors had known the full extent of the losses inflicted on past creditors, they would have felt better about Bueno and Bryant. But a failure to repay $500 seems worse, not better, than a failure to repay $300. Who has a better reputation: a person who fails to repay $500, or a person who fails to repay $300 and has an up-to-date $200 loan?

Losing money for other people usually does not help someone's reputation. If anything, the mistakes on the credit reports may have helped the reputations of Bueno and Bryant. The mistakes made it look like the bankruptcy discharges caused less mayhem for other creditors than they actually caused.

At the very least, one cannot lightly assume that this type of mistake harmed Plaintiffs' reputation. It may have helped, not hurt. Plaintiffs had the obligation to come forward with evidence supporting their theory. And after months of discovery, there is no evidence in the record that anyone thought less of Bueno and Bryant because of the mistakes on their credit reports.

## III.    Emotional Distress

Finally, Plaintiffs contend that they suffered an injury in the form of emotional distress, anxiety, humiliation, sleeplessness, and interference in their personal relationships. *See* Am. Cplt., at ¶ 168 (Dckt. No. 70).

A plaintiff does not have standing simply because he or she feels upset about something. After all, the fact that a plaintiff is upset about something is how lawsuits get started in the first place. Plaintiffs typically don't come to the federal courthouse because they think that things are going great.

The federal register is chock-full of cases about parties who lacked standing to sue, even though they felt upset about something. In *TransUnion*, the plaintiffs were undoubtedly unhappy that the company had flagged them as potential terrorists. *See TransUnion*, 594 U.S., at 433. In *Lujan*, the environmentalists' hearts went out to the crocodiles, elephants, and leopards. *See Lujan*, at 504 U.S., at 563–64. In *Spokeo*, the plaintiff was non-plussed that inaccurate information about him appeared on the internet. *See Spokeo*, 578 U.S., at 333. And so on.

A theory of standing needs to have a limiting principle. If feeling agitated were enough to give rise to an injury in fact, it would be Katy-bar-the-door when it comes to standing. Standing would become less of a checkpoint, and more of a turnstile.

Time and again, the Seventh Circuit has rejected attempts to establish standing based on an emotional reaction to a mistaken credit report. *See, e.g.*, *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 939 (7th Cir. 2022) ("[Plaintiff] further testified that she experienced emotional distress arising from her concern about being sued for the debt. But worry, like confusion, is insufficient to confer standing in this context."); *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 668 (7th Cir. 2021) ("As our bevy of recent decisions on [Federal Debt Collection Practices Act] standing makes clear, anxiety and embarrassment are not injuries in fact."); *Pennell v. Global Trust Mgmt., LLC*, 990 F.3d 1041, 1045 (7th Cir. 2021).

"[W]e have held that worry and anxiety are not the kind of concrete injury essential to standing. . . . If they were, almost everyone could litigate about almost anything, because just about everything anyone does causes some other people to fret. Imagine someone who asserts: 'The disclosure of my license number made me sad, and to cheer myself up I ate a chocolate bar.' The price of candy would be money out of pocket, but eating chocolate is not a normal

consequence of disclosures except through the bridge of worry." *Baysal v. Midvale Indem. Co.*, 78 F.4th 976, 977–78 (7th Cir. 2023) (citation omitted).

Plaintiffs do not give this Court a reason to stray from this case law. This Court does not see any path forward, either, except a path to the exits.

**Conclusion**

For the foregoing reasons, the motions to dismiss the claims by Plaintiffs Bueno and Bryant are hereby granted. The parties must file a statement addressing whether Plaintiff White suffered an injury in fact within two weeks.


Date: February 1, 2024

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　
Steven C. Seeger
United States District Judge