UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANGELICA BUENO, YVONNE BRYANT, and CHRISTINE WHITE, on behalf of themselves and all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) Case No. 22-cv-617 |
| v. | ) Hon. Steven C. Seeger |
| EXPERIAN INFORMATION SOLUTIONS, INC., | ) ) ) |
| Defendants. | ) ) |

## ORDER

Christine White sued Experian Information Solutions about a mistake on her credit report. Her credit report showed that she was up to date on an outstanding car loan when, in reality, the loan was discharged in bankruptcy.

White tried to get other car loans, but came up empty. She believes that potential lenders denied her request for a car loan because of the mistake on her credit report. She alleges an economic injury, reputational harm, and emotional distress.

Experian, in turn, moved to dismiss for lack of standing. Experian brings a factual challenge, building on a record compiled after months of jurisdictional discovery. Experian argues that White has not shown that she suffered an injury from the mistake on her credit report.

Based on the record, White has failed to satisfy her burden of showing that she suffered a real-world injury in fact. White lacks standing, so this Court lacks jurisdiction. For the reasons explained below, the motion to dismiss is granted.

### Background

This Court has already issued two opinions in this case in response to two prior motions to dismiss. *See* 3/27/23 Order (Dckt. No. 65); 2/1/24 Order (Dckt. No. 116). The Court assumes familiarity with those opinions by any interested reader.

The case began as a lawsuit between a different Plaintiff (Angelica Bueno) and Defendant Experian. Out of the gate, the Court dismissed Bueno's claims for lack of jurisdiction because she did not have standing. *See* 3/27/23 Order (Dckt. No. 65).

But the Court gave Bueno leave to amend, and gave the parties the green light to do jurisdictional discovery, too. *Id.* The Court gave Bueno an opportunity to "unearth the facts and build a record," and gave her a "chance to lay a factual foundation to stand on." *Id.* at 11.

Bueno accepted the invitation to amend the complaint. She brought two other plaintiffs on board, including Christine White and Yvonne Bryant. *See* Am. Cplt. (Dckt. No. 70). In the months that followed, the parties engaged in jurisdictional discovery.

In a nutshell, the amended complaint alleges that White's credit report contained a mistake because it failed to show that the loan was discharged in bankruptcy. So it continued to show a debt that no longer existed.

White filed for Chapter 7 bankruptcy in July 2022, and her debts were discharged in November 2022. *See* Am. Cplt., at ¶ 129 (Dckt. No. 70). The discharged debts included a car loan from Prestige Financial Services (the "Prestige Account"). *Id.* at ¶ 140.

White included the car loan from Prestige in her list of unsecured debts in the bankruptcy proceeding. *See* Bankr. Pet., at 22, 24–33 (Dckt. No. 120-2). White originally informed the bankruptcy court that she intended to keep the vehicle secured by that loan and enter into a reaffirmation agreement. *See* White Dep., at 40:12 – 45:21 (Dckt. No. 120-4); Bankr. Pet., at 55 (describing the Chevrolet covered by the Prestige loan, and stating that White intended to "[r]etain the property and enter into a *Reaffirmation Agreement*") (emphasis in original).

But she later changed her mind. *Id.* White did not enter into a reaffirmation agreement, so the Prestige loan was discharged in bankruptcy after all.

After the bankruptcy, Experian did not update her credit report to reflect the discharge of that debt. Experian mistakenly reported the Prestige Account as "open" and "never late" with a balance of $21,428. *See* Am. Cplt. at ¶ 141 (Dckt. No. 70); Def.'s Mem. in Support of Mtn. to Dismiss, at 1 (Dckt. No. 120). The balance should have been $0. *See* Am. Cplt. at ¶ 138. Experian did not report this account as "discharged in bankruptcy," as it should have. *Id.* at ¶ 140.

White later tried to get a car loan, but several potential lenders turned her down. *See* Am. Cplt. at ¶ 164 (Dckt. No. 70). She alleges that they denied her request for a loan because of Experian's inaccurate reporting of the Prestige Account. *Id.*

As White sees things, the mistake on her credit report is to blame for the denial of the car loans because the mistake negatively affected her debt-to-income ratio. *Id.* at ¶¶ 37–41, 158. The credit report included an "un-owed payment obligation." *Id.* at ¶ 158. That is, the report showed the Prestige Account as an outstanding loan, even though it was discharged in bankruptcy.

If Experian had accurately reported the status of that loan "with a zero balance and without monthly payment obligations," White's "credit score[] and/or DTI ratio[] would have

2

been better." *Id.* That allegation comes with a bright-shining caveat, wrapped in an all-powerful disclaimer: "upon information and belief." *Id.*

White couldn't get a car loan, so she bought an inferior car instead, at a less favorable interest rate. *Id.* at ¶ 165. As White explains it, she suffered emotional distress from the loan denials and resulting inconveniences, as well as reputational damage. *Id.* at ¶¶ 166, 168; *see also* Pl.'s Statement Regarding Damages, at 7–8 (Dckt. No. 123).

Shortly after White joined this case, Prestige Financial Services directed Experian to delete the Prestige Account. Experian did so, and White's credit score *dropped* by 65 points. *See* Def.'s Mem., at 4 (Dckt. No. 120). A lower number is worse.

White's credit score fell from 531 ("POOR") to 466 ("POOR"). *See* 4/25/23 Credit Report, at 1 (Dckt. No. 121-3); 5/15/23 Credit Report, at 1 (Dckt. No. 121-4).

That is, her credit report dated April 25, 2023 showed the outstanding Prestige loan. *See* 4/25/23 Credit Report (Dckt. No. 121-3). It showed three bankruptcy cases filed by White in 2021 and 2022, including a Chapter 13 filing in October 2021 (dismissed), a Chapter 7 filing in May 2022 (dismissed), and a Chapter 7 filing in July 2022 (discharged).

The credit report showed the auto loan from Prestige as an outstanding loan, even though it also showed the Chapter 7 bankruptcy in July 2022, and showed the status as "Chapter 7 bankruptcy discharged." *Id.* at 5. According to the report, White got a loan for $20,991 in June 2022, but the loan remained open even though White had filed for bankruptcy in July 2022. *Id.* at 6.

The credit report included the Prestige loan in the list of "YOUR POSITIVE ACCOUNT ACTIVITY." *Id.* at 4. The loan was "Open/Never late." *Id.* at 5.

Experian fixed the mistake. The credit report dated May 15, 2023 no longer showed the Prestige loan as an outstanding loan. *See* 5/15/23 Credit Report (Dckt. No. 121-4). The Prestige loan no longer appeared in the list of "YOUR POSITIVE ACCOUNT ACTIVITY." *Id.* at 4–5. Her credit fell to 466. *Id.* at 1.

Putting those numbers in perspective, the Experian credit reports include different categories, ranging from "Poor," "Fair," "Good," "Very Good," to "Exceptional." A range of 300–579 is "Poor." *Id.* at 2. So, White's credit score was in the "Poor" category each time. It went from to 531 ("Poor") to 466 ("Poor").

The credit reports explained the drop in the credit score. The credit reports included a page that gave the credit score, and then gave information under the heading "What May Be Helping." The report from April 2023 showed that White had three "accounts paid as agreed." *See* 4/25/23 Credit Report, at 2 (Dckt. No. 121-3). But the report from May 2023 showed that White had only one account "paid as agreed." *See* 5/15/23 Credit Report, at 2 (Dckt. No. 121-4). The number of "paid as agreed" accounts fell from three to one, based on the correction about the Prestige loan, and based on White's failure to pay a credit card.

3

Meanwhile, the parties continued to engage in jurisdictional discovery. Plaintiffs subpoenaed 13 potential lenders in search of documents that would support standing. *See* Def.'s Mem., at 4 (Dckt. No. 120). They also deposed a representative of one of those potential lenders, Ally Bank. *Id.*

The motions to dismiss came in waves. Again, the first motion to dismiss came at the beginning of the case, before jurisdictional discovery, when Bueno was the only Plaintiff.

The second motion to dismiss involved the claims of Plaintiffs Bueno and Bryant, but not White. Experian moved to dismiss the claims of those two Plaintiffs, and this Court granted that motion and dismissed their claims for lack of standing. *See* 2/1/24 Order (Dckt. No. 116).

Along the way, this Court *sua sponte* raised whether White suffered an injury in fact. *Id.* at 9 n.1. This Court did so because federal courts have an independent obligation to doublecheck the existence of jurisdiction.

Experian responded that, when it filed the second motion to dismiss, the parties were wrapping up jurisdictional discovery for the claims by White. *See* Def.'s Statement Regarding Pl. Christine White's Standing, at 2 (Dckt. No. 118). That's why the second motion to dismiss involved Bueno and Bryant, but not White.

That same day, Experian filed the third motion to dismiss, meaning the motion at hand. Experian argues that White also lacks standing. *See* Def.'s Mem., at 1–2 (Dckt. No. 120).

**Legal Standard**

Article III standing has three familiar elements: (1) injury in fact; (2) causation; and (3) redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The question here is whether White has shown an injury from Experian's inaccurate reporting. If not, she lacks standing.

To establish an injury in fact, a plaintiff must show that she suffered "an invasion of a legally protected interest" that is "actual or imminent, not conjectural or hypothetical." *Id.* at 560. "[S]tanding requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). The injury "must actually exist," must be "real," and must not be "abstract." *Id.* at 340.

The Supreme Court made clear in *Spokeo* that an inaccurate credit report does not automatically lead to an injury in fact that supports standing. "[N]ot all inaccuracies cause harm or present any material risk of harm." *Id.* at 342.

White seems to think that mere dissemination of inaccurate credit information constitutes an injury. *See* Pl.'s Mem. in Opp. to Mtn. to Dismiss, at 4–5 (Dckt. No. 126). Not so. The inaccuracy must have caused harm or created an "imminent and substantial" risk of future harm. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 415 (2021). A "bare procedural violation" doesn't count. *See Spokeo*, 578 U.S. at 341.

Here, Experian challenges White's standing, arguing that she has not suffered an injury from its inaccurate reporting.

A party can bring a facial challenge or a factual challenge to standing. A facial challenge looks to the allegations of the complaint, but a factual challenge looks to the evidence. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). When a complaint is "facially sufficient, [but] external facts call[] the court's jurisdiction into question," a challenge to standing is factual. *Id.*

A facial challenge looks at the curtain drawn down by the plaintiff in the complaint. But a factual challenge looks behind the curtain, and takes a peek at what's really going on behind the scenes.

Here, Experian challenges the facts underlying White's standing, not whether those facts, if true, would give her standing. Experian also describes its challenge to White's standing as "factual." *See* Def.'s Mem., at 7 n.4 (Dckt. 120). White does not challenge this characterization. *See generally* Pl.'s Mem. (Dckt. No. 126). So this Court will treat Experian's challenge as a factual challenge.

When a party makes a factual challenge, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital*, 572 F.3d at 444.

Pointing to the complaint is not enough when a party makes a factual challenge to standing. A factual challenge is about facts, not allegations. *See Baysal v. Midvale Indem. Co.*, 78 F.4th 976, 978 (7th Cir. 2023) ("[S]tanding must be demonstrated as well as alleged.").

The whole point of a factual challenge to standing is to pierce the pleading veil. Pointing to a complaint in response to a factual challenge to standing is the jurisdictional equivalent of "because I said so." And "because I said so" isn't convincing to anyone, except parents.

The party who brings a case to the federal courthouse has the burden to show that the case belongs in the federal courthouse. So White "bears the burden of proving standing by a preponderance of the evidence." *Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 625 (7th Cir. 2017); *see also Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880, 888 (N.D. Ill. 2020).

White appears to suggest that the Court should assess jurisdictional facts in her favor, or that scrutinizing them is "inappropriate[]." *See* Pl.'s Mem., at 7 (Dckt. No. 126); *see also id.* at 6 (invoking the "Rule 12 standard"). But the whole point of a factual challenge is to look behind the curtain of the complaint, and see what's there. *See Lujan*, 504 U.S. at 560–61.

Here, when it comes to an injury in fact, there's no *there*, there.

5

**Discussion**

White contends that she suffered three types of injuries: an economic injury, a reputational injury, and emotional distress. *See* Am. Cplt. at ¶¶ 164–68 (Dckt. No. 70). The Court will address each of the alleged injuries in turn.

**I.    Economic Injury**

The first alleged injury is an economic injury. White believes that the mistake on her credit report prevented her from getting a car loan at favorable rates. She contends that she would have secured a car loan, or would have obtained a loan at better rates, if not for the mistake on her credit report.

As a starting point, White faces an uphill battle when arguing that the mistake on her credit report caused her an injury. Ordinarily, a track record of paying back creditors and staying up-to-date on loans is a good thing, not a bad thing. Creditors like to get paid, and don't like to get stiffed.

The credit report from April 2023 included a mistake. But by the look of things, the mistake was a helpful mistake, not a harmful mistake. The credit report showed that White was up to date on the Prestige loan. It included the loan in the section about "YOUR POSITIVE ACCOUNT ACTIVITY." *See* 4/25/23 Credit Report, at 4 (Dckt. No. 121-3).

If anything, it looks like the mistake was helpful, not hurtful. It looks like White got a windfall. And a windfall isn't an injury.

When Experian corrected the mistake, the credit report no longer included the Prestige loan in the list of positives. And her credit score went *down*, not up.

The corrected credit report in May 2023 did not show the Prestige loan as discharged. Instead, the credit report deleted the Prestige auto loan from the report entirely. And her credit score fell by 65 points. So, instead of moving the Prestige loan from the proverbial "good" category to the proverbial "bad" category, the corrected report simply made the loan disappear.

To be fair, the 65-point drop coincided with a missed payment on a new credit card, so the drop likely cannot be attributed entirely to Experian's correction. *See* Def.'s Mem., at 4 (Dckt. No. 120). Nonetheless, this drop directionally suggests that Experian's mistake did not harm White. Plaintiff argues that considering this evidence would be "inappropriately accept[ing] contested fact." *See* Pl.'s Mem., at 7 (Dckt. No. 126). But evaluating the facts is the Court's task in assessing Experian's factual challenge to standing.

White attempts to show an injury based on her debt-to-income ratio. She argues that Experian's reporting of a $21,428 balance on her Prestige loan resulted in an inaccurate, elevated debt-to-income ratio.[1] *See* Am. Cplt. at ¶ 165 (Dckt. No. 70); Pl.'s Mem., at 12. Because of that

---

[1] As an aside, that number ($21,428) apparently comes from a credit report dated February 15, 2023. That report isn't in the record. By the look of things, the parties submitted the credit reports from April

artificially high debt-to-income ratio, White states that multiple lenders denied her application for a car loan. *See* Am. Cplt., at ¶ 165.

Theoretically speaking, it is possible that a mistake on someone's credit report could adversely affect that person's debt-to-income ratio. And it is a possible that a mistaken debt-to-income ratio could adversely affect that person's ability to get a loan.

For example, imagine if a person made $50,000 per year, and had $20,000 in debt. That's a debt-to-income ratio of 40% (*i.e.*, $20,000 / $50,000 = 40%). Let's imagine that a lender will not give a loan to anyone with a debt-to-income ratio over 40%.

Imagine if the credit report inaccurately stated that the person had $30,000 in debt, not $20,000 in debt. That's a debt-to-income ratio of 60% (*i.e.*, $30,000 / $50,000 = 60%). In this hypothetical, the lender will not give the consumer a loan with a ratio that high. So, if the credit report mistakenly included $10,000 in debt, and showed that the debt is $30,000 when it is really $20,000, the consumer might be out of luck.

In that situation, the consumer might have standing under Article III. If the consumer could show that the credit report artificially increased the debt-to-income ratio, and if the consumer could show that the inflated debt-to-income ratio led to the denial of a loan, that consumer presumably would suffer an injury in fact for standing purposes.

That example illustrates how things might play out in theory. But a factual challenge is no time for theory. A factual challenge is "show me" time.

White has the burden to show that she suffered an injury. And on this record, White fell short. White appeals to "common sense." *See* Pl.'s Mem., at 7 (Dckt. No. 126). Common sense can get you pretty far in life, including in a courtroom. But when it comes to a factual challenge, "common sense" alone doesn't cut it.

By and large, White does not present any evidence that any potential lender ever calculated her debt-to-income ratio, let alone did so based on the Experian credit report. White also does not present any evidence that the correct debt-to-income ratio would have made a difference to any potential creditors. Maybe they would have denied her a car loan anyway.

After months of discovery, White has turned up no evidence that she was harmed by Experian's reporting, either because a lender denied her a loan or charged her a higher interest rate. *See* Def.'s Mem., at 10 (Dckt. No. 120). It wasn't for lack of trying, or for lack of an opportunity. After all, Plaintiffs served 13 subpoenas.

At best, White points out that several potential lenders knew her credit score from Experian. Several of the loan denial letters included a reference to her credit score. *See* Pl.'s

---

and May 2023, but not February 2023. But White did testify about it at deposition. *See* White Dep., at 47:17 – 48:18 (Dckt. 121-2). Anyway, the exact number doesn't matter, except to readers (and writers) who want to know where numbers come from.

Mem., at 9 (Dckt. No. 126). But there is a difference between knowing a credit score, and taking that credit score into account when making a lending decision.

And more importantly, a credit score is not the same thing as the debt-to-income ratio. A potential lender could know a person's credit score, without knowing that person's debt-to-income ratio.

Again, White's theory is that the mistake on her credit report affected her debt-to-income ratio in an adverse way, and that potential lenders relied on that ratio when they turned her down for a loan. That's a theory. That's not a fact in the record.

The closest that White comes is the denial letter from Global Lending Services. *See* 12/27/22 Global Lending Services Letter, at 5 (Dckt. No. 126-4). That letter said that Global Lending Services had received reports from Experian, Equifax, and Lexis Nexis. The letter added that Global Lending Services used White's credit score from Experian (517) and from Equifax (578) when making its "credit decision." *Id.*

The letter then included a long paragraph with a laundry list of reasons for the denial of the loan. "Key factors that adversely affected your credit score: Serious delinquency, and public record or collection filed, Too many accounts with balances, Length of time Revolving accounts have been established, Ratio of balances to credit limits is too high on Bank Revolving or other Revolving accounts Serious delinquency and Public Record OR Collection filed Time since delinquency is too recent or unknown Ratio of balance to limit on bank revolving or other rev accts too high Too many accounts with balances." *Id.* (omitting a host of potential "sic"s).

That run-on paragraph is not much of a basis for Article III standing. It reads like a boilerplate summary, not a consumer-specific description of why White didn't get a loan.

True, it does refer to the "ratio" of "balances to credit limits." *Id.* But it does not say that Global Lending Services calculated her debt-to-income ratio, or did so based on the information in the Experian report.[2]

The letter also does not support the notion that the mistake led to a material change in the ratio. It does not support the notion that, but for the mistake, White would have had an acceptable debt-to-income ratio. And it does not support the notion that, but for the mistake, Global Lending Services would have given White a loan.

In fact, the paragraph describes what factors "affected your credit score" in general. It explains why the credit score is what it is. It explains a credit score, not a lending decision.

White had a full opportunity to depose a witness from Global Lending Services to sort it out, pin things down, and figure out why the company denied her a loan. White took a pass.

---

[2] The full description of this factor reads: "Ratio of balances to credit limits is too high on Bank Revolving or other Revolving accounts." *See* 12/18/22 Capital One Letter (Dckt. No. 126-5). An auto loan is not a revolving account, so it's not clear that Experian's mistake on the Prestige Account would even have any bearing on this factor.

In a similar vein, the denial letter from another potential lender, Capital One, does not support the notion that White suffered an injury. Capital One denied her credit because she had "limited credit card experience," "too many delinquent past or present credit obligations," "too many recent inquiries," and "insufficient credit history." *See* 12/18/22 Capital One Letter, at 2 (Dckt. No. 126-5).

That letter didn't mention her debt-to-income ratio. It did mention her "many delinquent" obligations. *Id.* But again, the mistaken credit report showed that her Prestige loan *wasn't* past due. It showed that she was up to date.

The other denial letter from Capital One doesn't help her cause either. *See* 12/12/22 Capital One Letter, at 2 (Dckt. No. 126-6). Capital One states that it may have used unspecified "information" from Experian, Equifax, and TransUnion. *Id.* The reasons for the denial of the loan included "[r]evolving credit limits are too low," "[t]here are too many delinquent past or present credit obligations," and "[p]roportion of revolving account balances(s) to credit limit or high credit is too high."[3] *Id.* Again, that's too slender of a reed to provide a foothold for standing.

White took one deposition, taking the testimony of a witness from Ally Bank. *See* Def.'s Mem., at 4 (Dckt. No. 120). Ally did receive a credit *score* from Clarity, an Experian affiliate. *Id.* at 2. But it never received an Experian credit *report*, which would have shown account-level data and permitted Ally to calculate White's debt-to-income ratio. *Id.* And Ally didn't even use the Clarity score in its decision-making process for White. Instead, it relied on a report from TransUnion. *Id.*

The testimony from Ally's corporate representative washed away any notion that White suffered an injury based on the Experian credit report. Ally's letter explained the basis for the credit score, not the basis for a lending decision. And Ally didn't even receive the Experian credit report:

> Q: Okay. So this is a letter from Ally, which is dated December 17, 2022, which basically says we must regretfully inform you that we are not agreeable to handling the proposed transaction. Do you see that the decision was based in whole or in part on information provided by Experian?
>
> A: Yes, I do.
>
> Q: And if I scroll down to the Experian report information, do you see the key factors that adversely affect the credit score?
>
> A: Yes, I do.
>
> Q: And do you see the one that is listed a balance on an open account is too high compared to loan amounts?

---

[3] Again, it's important to note that the Prestige auto loan is not a revolving account.

> A: Yes, I do.
>
> Q: Would you agree that any one of these reasons could be a significant factor in Ms. White's decline of her loan?
>
> A: No, I would not agree.
>
> Q: You would not agree that any of these could be a factor in her declination of her loan?
>
> A: Those factors are supportive of why the score is ranked what it is, not what we made our credit decision on.
>
> Q: Do you agree that this – that her balance on an open account is – that it's not possible that a decision was made because she had a $21,000 open loan on an auto loan?
>
> A: The reasons provided in this letter are associated only with the reason that her score is what it is. They were not associated with our credit decision.
>
> Q: So what was associated with your credit decision?
>
> A: The information we obtained from the credit bureau that was used to evaluate the transaction.
>
> Q: And which credit bureau was that?
>
> A: *TransUnion*.
>
> Q: So you didn't obtain any information from Experian?
>
> A: We obtained information from Experian. *We did not obtain a credit report from Experian*.

*See* Maynard Dep., at 19:1 – 21:1 (Dckt. No. 121-2) (emphasis added) (objections omitted). Ally's corporate representative also testified that the Experian/Clarity credit score "wasn't used as part of the decision" on White's application for a car loan. *Id.* at 27:16 – 28:10.

After months of jurisdictional discovery, White largely came up empty. White blames the potential creditors for only producing the bare minimum requested by her subpoenas. *See* Pl.'s Mem., at 8–9 (Dckt. No. 126). That's neither here nor there. The lack of evidence is what matters, not why White lacks evidence.

White also points to her own deposition testimony, but that testimony doesn't get her very far, either. She expressed her belief that she did not get a car loan because of the mistake on

her credit report showing an outstanding balance on her Prestige loan of almost $22,000. *See* White Dep., at 78:11 – 79:11, 82:21 – 83:4, 94:5-18 (Dckt. No. 126-2). That's speculation, and when it comes to standing, speculation doesn't cut it.

White also argues that employees at the car dealerships told her that the balance on her Prestige loan kept her from getting another loan. Even if that's true, that's hearsay or double hearsay. White testified about what Car Dealer Employee X said about what they learned from Potential Lender Y.

White also comes forward with an expert declaration, but that report doesn't get her very far. *See generally* Tarter Decl. (Dckt. No. 126-3). The report is unchanged since the Court dismissed the claims of Bueno and Bryant, and the Court sees no difference this go-around. *See* 2/1/24 Order, at 14 (Dckt. No. 116).

As a reminder, that declaration offered little information about Plaintiffs themselves. *See id.* (Dckt. No. 116). Instead, it discussed debt-to-income ratios at a high level of abstraction. And it assumed the facts presented in the complaint. That's not helpful "when the goal is to figure out *whether* the facts in the complaint [underlying standing] are true." *See id.* (emphasis in original).

In other words, Tarter's *theory* might suggest a higher debt-to-income ratio hurt White. As discussed above, each of us "can handle only so much debt, given our incomes." *See id.* at 16 (Dckt. No. 116). But the report is lacking any *facts* to that effect. The report does not support the proposition that any potential lender calculated her debt-to-income ratio, or that the mistake on her credit report made a difference when she did not get new car loans. In short, the Tarter declaration did not advance the ball before, and it takes White no closer to the goal line.

At the end of the day, White had more than ample opportunity to gather the facts, build a record, and show that she suffered an injury as a result of the mistake on her credit report. White came up empty. She has not satisfied her burden of showing that the mistake caused her to suffer an economic injury.

## II.     Reputational Injury

Next, White argues that she suffered a reputational injury. White devotes relatively little attention to this argument, perhaps because this Court rejected a similar argument by Bueno and Bryant. *See* 2/1/24 Order, at 18–22 (Dckt. No. 116).

White argues that Experian's "false reporting itself was the injury." *See* Pl.'s Mem., at 15 (Dckt. No. 126) (quoting *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021)). She seems to think that she has experienced a *per se* reputational harm. *See id.* (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)).

But that's not what *Ramirez* said. *Ramirez* primarily addressed the publication of inherently defamatory information. The names of some of the plaintiffs appeared on a government list of "terrorists, drug traffickers, and other serious criminals." *See id.* at 413. The

11

Supreme Court in *Ramirez* did not back away from the bedrock rule laid down in *Spokeo* that a credit reporting inaccuracy is not inherently a reputational harm. *See Spokeo*, 578 U.S. at 342.

The Eleventh Circuit in *Losch* addressed a similar situation. There, the credit agency falsely reported a past-due mortgage balance. *See Losch*, 995 F.3d at 941. The key element that established an injury wasn't the falsity of the report. It was the defamatory nature of the report, which represented that the plaintiff did not pay his debts on time. *Id.* at 942–43.

Here, Experian didn't "portray[] [White] as a deadbeat who does not pay her debts," the kind of derogatory information that creates an injury. *See Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1154 (7th Cir. 2022); *see also* 2/1/24 Order, at 18 (Dckt. No. 116). In fact, Experian portrayed White more *positively* than was warranted. Again, it showed that White was up to date on that loan.

Paying debts on time is a good thing, not a bad thing, from a reputational standpoint. And it's certainly better than declaring bankruptcy and leaving creditors holding the bag. If anything, Experian's mistake benefited White's reputation.

Like Bueno and Bryant, White essentially argues that she "would have had a *better* reputation with future creditors if the creditors had known the full extent of the losses that [she] caused when [she] filed for bankruptcy." *See* 2/1/24 Order, at 20 (Dckt. No. 116).

White gets it backwards. Creditors want their money back. Creditors want to see borrowers reliably paying their debts, not defaulting on them. Portraying a person as a dependable borrower isn't likely to turn off potential creditors.

At the very least, White had the burden to come forward with evidence showing reputational harm. But her upside-down theory of harm is "much too 'conjectural or hypothetical' to constitute the type of concrete injury that is required to establish Article III standing." *See Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 669 (7th Cir. 2015) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

In short, White has not carried her burden of showing that she suffered a reputational injury based on the Experian report. If anything, Experian might have helped her.

### III. Emotional Distress

Finally, White alleges that she suffered emotional distress from the mistake on her credit report.

That theory of injury fails too. White broadly alleges stress, anxiety, and embarrassment because she lacked access to a car and had to undergo a difficult car-buying experience. *See* Pl.'s Statement Regarding Damages, at 7–8 (Dckt. No. 123).

But the Seventh Circuit has consistently deemed similar emotional reactions to mistaken credit reporting insufficient to support standing. *See, e.g.*, *Wadsworth v. Kross, Lieberman &*

*Stone, Inc.*, 12 F.4th 665, 668 (7th Cir. 2021) ("As our bevy of recent decisions on [Federal Debt Collection Practices Act] standing makes clear, anxiety and embarrassment are not injuries in fact."); *Baysal*, 78 F.4th at 977–78 ("[W]e have held that worry and anxiety are not the kind of concrete injury essential to standing. . . . If they were, almost everyone could litigate about almost anything, because just about everything anyone does causes some other people to fret.").

This Court dismissed the claims by Bueno and Bryant based on that case law. *See* 2/1/24 Order, at 23 (Dckt. No. 116). The Court reaches the same result for White, too.

## Conclusion

For the foregoing reasons, the motion to dismiss the claims of Plaintiff White is hereby granted.

Date: September 27, 2024

Steven C. Seeger
United States District Judge